UNITED STATES of America,
Appellant,

v.

Ronald SENTAMU, Defendant–
Appellee.

Docket No. 99–1315

United States Court of Appeals,
Second Circuit.

Argued: Jan. 3, 2000

Decided: May 12, 2000

Jonathan E. Davis, Assistant United States Attorney, Brooklyn, New York (Loretta E. Lynch, United States Attorney for the Eastern District of New York, David C. James, Assistant United States Attorney, Brooklyn, New York, on the brief), for Appellant.

Abraham L. Clott, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, New York, for Defendant-Appellee.

Before: FEINBERG, KEARSE, and SACK, Circuit Judges.

KEARSE, Circuit Judge:

The United States appeals from so much of a judgment of conviction entered in the United States District Court for the Eastern District of New York, Charles P. Sifton, then-*Chief Judge*, as sentenced defendant Ronald Sentamu below the range of imprisonment prescribed by the Sentencing Guidelines ("Guidelines"). Sentamu, a citizen of Uganda, was convicted, following his plea of guilty, of importing heroin into the United States, in violation of 21 U.S.C. § 952(a) (1994), and *id.* § 960(b)(3) (Supp. III 1997). After various adjustments not at issue on this appeal, the Guidelines imprisonment range applicable to him for that offense was 30–37 months. Over the government's objection, the district court departed from that range and imposed a prison term of 27 months, ruling that Sentamu's consent to removal from the United States at the conclusion of his incarceration, without further proceedings, provided unusual assistance to the Immigration and Naturalization Service ("INS") in the administration of justice. On appeal, the

government contends that because Sentamu proffered no colorable defense to removal, the downward departure was contrary to this Court's decision in *United States v. Galvez–Falconi,* 174 F.3d 255 (2d Cir.1999), and was not authorized. For the reasons that follow, we agree, and we vacate the judgment and remand for resentencing within the Guidelines.

## I. BACKGROUND

In June 1998, Sentamu arrived at John F. Kennedy International Airport on a flight from Germany and was subjected to a routine customs examination. During the examination, a customs inspector found Sentamu to be nervous and noticed that his shoes seemed unusually thick. A probe of the shoes revealed approximately 490 grams of heroin. Sentamu was charged with possession of narcotics with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(i) (1994), and with importation, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 960(b)(2)(A) (1994).

Pursuant to a July 28, 1998 plea agreement, Sentamu pleaded guilty to importation in violation of 21 U.S.C. §§ 952(a) and 960(b)(3); the distribution count was to be dismissed. In October 1998, Sentamu also entered into a stipulation with the INS permitting his removal from the United States, at the conclusion of his imprisonment, without a hearing or process of any sort. A removal order for Sentamu was issued, pursuant to that stipulation, prior to the scheduled date for his sentencing.

### A. *The Sentencing Dispute*

According to the Guidelines drug quantity table, Sentamu's base offense level was 28. The presentence report ("PSR") on Sentamu recommended a number of reductions for such factors as acceptance of responsibility and minimal role in the offense, and arrived at a total offense level of 19. Given Sentamu's criminal history category of I, the range of imprisonment prescribed by the Guidelines was 30–37 months. Sentamu asked the district court to depart downward one step from that range because of his "voluntar[y] agree[ment] to be deported from the United States," and, in any event, to take into consideration his "immaturity" and acceptance of responsibility in determining at which end of the Guidelines range to sentence him. (Status Conference Transcript, November 4, 1998, at 2, 3.)

The government opposed the requested departure for Sentamu's agreement to deportation. Although in 1996 the United States Attorneys for the Eastern and Southern Districts of New York ("US Attorneys") had adopted a policy of supporting one-step downward departures under § 5K2.0 of the Guidelines for deportable alien defendants who pleaded guilty and consented to deportation as part of their plea agreements ("1996 policy"), the government pointed out, in opposing such a departure for Sentamu, that in July 1998 the U.S. Attorneys had given notice that they were discontinuing the 1996 policy. The U.S. Attorneys' joint July 1998 letter, addressed to the then-Chief Judges of both Districts, explained that the 1996 policy of supporting such departures had been instituted "on a trial basis" and that the policy was being discontinued because

> stipulating to deportation itself provides a significant benefit to an alien defendant and ... further incentives, such as a reduction in the defendant's criminal sentence, are not warranted,

(Letter from Zachary W. Carter and Mary Jo White to then-Chief Judge Charles P. Sifton and then-Chief Judge Thomas P. Griesa, dated July 10, 1998, at 2);

> the administrative burden of deportation without stipulation has been substantially reduced for certain classes of aliens by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, ... with the result that the benefits to the government of stipulated deportation are reduced,

*id.;*

> the practice of agreeing to recommend downward departures for stipulated de-

portation has created unfair disparities among similarly situated defendants, *id.;* and

the only circuit court to consider the issue has concluded that such departures are not authorized by Section 5K2.0 of the Sentencing Guidelines. *See United States v. Clase–Espinal,* 115 F.3d 1054 (1st Cir.), *cert. denied,* 522 U.S. 957, 118 S.Ct. 384, 139 L.Ed.2d 299 (1997),

*id. See generally United States v. Galvez–Falconi,* 174 F.3d at 259 (discussing the Justice Department's authorization of the 1996 policy and the reasons for the policy's termination); *United States v. Montez–Gaviria,* 163 F.3d 697, 704–05 (2d Cir. 1998) (same). The district court asked Sentamu and the government to submit briefs on the question of whether a departure in recognition of a defendant's consent to deportation was permissible in general and warranted here.

Sentamu submitted a letter brief arguing that the U.S. Attorneys' 1996 policy had been introduced to effectuate Congress's directive, *see* 8 U.S.C. § 1228(a)(1) (Supp. III 1997), that "the Executive Branch ... take steps to ensure that aliens convicted of certain crimes are deported as soon as practicable after completing their prison terms." (Letter from Legal Aid Society Attorney Douglas G. Morris to then-Chief Judge Charles P. Sifton dated November 24, 1998 ("Sentamu Letter"), at 2.) Sentamu argued that the INS "continues to face problems in meeting the Congressional mandate to promptly process deportable alien inmates" and that "the INS continues to derive substantial assistance from a defendant's voluntary agreement to be deported." (*Id.* at 1.) The brief attached an October 16, 1998 report from the United States General Accounting Office to the House of Representatives Committee on the Judiciary's Subcommittee on Immigration and Claims, entitled "CRIMINAL ALIENS [ ] INS' Efforts to Remove Imprisoned Aliens Continue to Need Im-

provement." The report stated that the INS remained in arrears in achieving the expeditious removal of deportable criminal aliens, including aggravated felons.

The government submitted a letter brief arguing, *inter alia,* that downward departures for a defendant's consent to deportation are not authorized by the Guidelines, because a "stipulation to deportation by an aggravated felon is neither special nor unusual in kind or degree." (Letter from Assistant United States Attorney Jonathan E. Davis to then-Chief Judge Charles P. Sifton dated December 23, 1998 ("Government Letter"), at 5–6.) The government also argued that the INS does not materially benefit from a convicted alien's consent to deportation, because "[i]mmigration laws enacted in 1996 have eliminated substantially all of the administrative and judicial burdens that a criminal alien opposing deportation could previously oblige the [INS] to shoulder." (*Id.* at 2.) With respect to its lowered burdens, the government cited in particular the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), P.L. No. 104–132, 110 Stat. 1214 (April 24, 1996), and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), P.L. 104–208, 110 Stat. 3009 (Sept. 30, 1996). It pointed out that AEDPA "repealed the provisions of 8 U.S.C. § 1105a that authorized judicial review of orders of deportation for many categories of aliens convicted of a crime, including ·all defendants convicted of aggravated felonies, narcotics offenses or firearms offenses," and that IIRIRA expanded the definition of "aggravated felon" to include most aliens convicted of felonies, and narrowed the scope of habeas corpus review for alien felons facing deportation. (Government Letter at 4.) IIRIRA also authorized "administrative reinstatement of prior deportation orders ..., 8 U.S.C. § 1231, thus permitting summary deportation of aliens previously deported and eliminating the need for new deportation proceedings." (Government Letter at 4.) The government concluded

that "the deportation reforms have created a system in which the INS's burdens are far less onerous with respect to the great majority of deportable inmates, including defendant." (*Id.* at 4–5.)

### B. *The Decision To Depart*

In an unpublished Memorandum and Order filed on April 14, 1999 ("Opinion"), the district court granted Sentamu's motion for a one-step downward departure in recognition of his consent to deportation. The court began by noting that as to an alien convicted of an aggravated felony, the INS is to complete deportation proceedings, to the extent possible, by the time the alien is released from incarceration for the underlying felony, *see* 8 U.S.C. § 1228(a)(3)(A) (Supp. III 1997). Opinion at 2. The court found, however, that compliance with that Congressional directive is hampered by the fact that "the deportation of an alien convicted of an aggravated felony [is], as a practical matter, a lengthy administrative process." *Id.* at 10.

> [D]eportation proceedings must be commenced by the filing of a written notice to appear with the immigration court and personal service of the notice upon the alien defendant. *See* 8 C.F.R. § 239.1 (1999). While the Immigration and Nationality Act, as amended by IIRIRA, now authorizes the INS to conduct deportation proceedings through videoconferencing, most deportation hearings are conducted in person before an immigration judge. 8 U.S.C. § 1229a(b).... The alien defendant has the right to representation, at his own expense, by counsel of his choice. 8 U.S.C. § 1229a(b)(4). Because the immigration judge is authorized to grant a reasonable adjournment of the deportation proceedings sua sponte or upon good cause shown by the alien or the INS, 8 C.F.R. § 240.6 (1999), many judges feel obliged to delay the proceedings, often repeatedly and over long periods of time, until the aliens can obtain counsel.... At the hearing, the alien must have a reasonable opportunity to examine the evidence against him, to present evidence on his own behalf, and to cross examine the government's witnesses. 8 U.S.C. § 1229a(b)(4); C.F.R. § 240.10(a). If the alien does not admit the factual allegations and his deportability, the immigration judge must request the assignment of INS counsel and must receive evidence regarding any unresolved issues of law or fact. 8 C.F.R. § 240.10(d) (1999). The INS has the burden of establishing by clear and convincing evidence that the alien is deportable. 8 U.S.C. § 1229a(c)(3). The INS must keep a complete record of the hearing, *id.*; 8 C.F.R. § 240.9 (1999), and the immigration judge must issue an oral or written decision as to the alien's deportability, including the reasons therefor. 8 U.S.C. § 1229a(c)(1); 8 C.F.R. § 240.12. The alien has the right to appeal the immigration judge's decision to the Board of Immigration Appeals by filing a notice of appeal within thirty days of the decision, 8 C.F.R. § 240.15, and may also file one motion to reopen the proceedings upon the basis of new facts within ninety days of the decision. 8 U.S.C. § 1229a(c)(6).

Opinion at 25–27 (footnote and internal quotation marks omitted).

In light of these normal procedural burdens, the court rejected the government's suggestion that the administrative burden associated with deporting a criminal alien is *de minimis*, finding that the government had "confus[ed] the burden of proof the INS must satisfy in deportation proceedings for criminal aliens with the administrative burden on the INS of conducting those deportation proceedings." Opinion at 24. The court stated that

> [w]hile the INS can establish the deportability of an alien defendant merely by submitting a copy of the official record of judgment and conviction or guilty plea, 8 U.S.C. § 1229(a), (c)(3), it still must expend substantial time and resources to conduct deportation proceed-

ings pursuant to the requirements of 8 U.S.C. § 1229 and 1229a and the accompanying regulations.

Opinion at 25.

The court also stated that, without defendants' stipulations to deportation, "it is altogether likely that ... the INS [would] be unable to fulfill its statutory duties in this case and other similar cases." Opinion at 21–22. It found that although IIRIRA's mandatory detention provisions went into full effect in 1998, "the INS remains unable to comply with those provisions due to substantial administrative problems and insufficient resources." Opinion at 28. It found that, in the case of Sentamu in particular, the consent to deportation had provided substantial assistance to the INS, since it

> reduced the amount of time, effort, and resources the INS must spend in order to comply with its statutory duties under IIRIRA.... Instead of a lengthy administrative process, a final deportation order was entered against Sentamu solely on a written record and without a hearing in front of an immigration judge.... As a result, the INS will be able to fulfill its statutory duties with regard to Sentamu and, at the same time, gain the benefit of devoting its scarce detention space and resources to other individuals.

Opinion at 34–35.

Finally, the district court found that assistance such as Sentamu provided the government is not adequately accounted for in the Guidelines. Opinion at 39. The court reasoned that the "very existence" of Guidelines § 5K1.1, which authorizes departures for a defendant's assistance in the prosecution or investigation of other persons, indicated that the Guidelines encourage departures in recognition of a defendant's assistance to the government. *Id.* at 35. The court acknowledged the view of the First Circuit in *U.S. v. Clase-Espinal,* 115 F.3d 1054 (1st Cir.), *cert. denied,* 522 U.S. 957, 118 S.Ct. 384, 139 L.Ed.2d 299 (1997), that it was "exceedingly improba-

ble" that the Sentencing Commission had overlooked stipulated deportations altogether. *See* Opinion at 36. However, the court found

> [n]othing in the Guidelines [to] suggest[ ] that the Commission was aware of or gave consideration to the substantial administrative problems which prevent the INS from complying with its statutory duties or the unusual type of assistance in complying with those duties which is provided to the INS by Sentamu and other similarly situated alien defendants.

*Id.* at 38. The court stated that

> the Second Circuit has recognized that a defendant's cooperation with the government in respects other than in the context of criminal prosecutions of other persons is a factor sufficiently distinct from the departures authorized by [Guidelines] §§ 5K1.1 and 3E1.1 [for acceptance of responsibility] that it may warrant a departure under § 5K2.0 if the particular or unusual circumstances of a case show that the defendant did provide assistance to the government in a fashion not considered by the Commission.

Opinion at 11 (citing *United States v. Agu,* 949 F.2d 63, 67 (2d Cir.1991), *cert. denied,* 504 U.S. 942, 112 S.Ct. 2279, 119 L.Ed.2d 205 (1992)). The court concluded that a one-step downward departure under § 5K2.0 is warranted by an alien defendant's agreement to be deported.

### C. *The Denial of Reconsideration in Light of* Galvez–Falconi

By letter dated April 19, 1999, the government moved for reconsideration in light of this Court's decision in *United States v. Galvez–Falconi,* 174 F.3d 255 (2d Cir. 1999), which had been issued contemporaneously with the district court's Opinion, and in which this Court stated that

> a defendant seeking a departure under § 5K2.0 for consenting to deportation must present a colorable, nonfrivolous

defense to deportation, such that the act of consenting to deportation carries with it unusual assistance to the administration of justice,

*id.* at 260. The government argued that because Sentamu had never asserted any defense to deportation, let alone a colorable one, he was not entitled to a downward departure under Guidelines § 5K2.0.

In a Memorandum and Order dated April 28, 1999 ("Reconsideration Order"), the court denied the government's motion for reconsideration. It distinguished *Galvez–Falconi* principally on the ground that the defendant in that case, unlike Sentamu, had previously been deported and was convicted of reentering illegally, an offense that subjected him to summary deportation proceedings:

> [I]f an alien defendant has been convicted of unlawfully re-entering the United States after having been deported, 8 U.S.C. § 1231(a)(5) provides that the prior order of deportation is reinstated from its original date and is not subject to being reopened or reviewed. It further provides that the alien is not eligible and may not apply for any relief from deportation and can be deported under the prior order at any time after the alien's re-entry. *See* 8 U.S.C. § 1231(a)(5) (West 1998 Supp.) The [INS] thus is able to summarily deport an alien defendant convicted of unlawful re-entry without instituting any new deportation proceedings. By contrast, to deport Sentamu and other similarly situated alien defendants who have not been convicted of unlawful re-entry, the INS must complete a lengthy administrative process before it can deport them.

Reconsideration Order at 3–4. The court also found that the *Galvez–Falconi* court had not had the benefit of the "extensive factual record before this Court relating the substantial administrative problems which prevent the INS from complying with its statutory responsibilities to detain and expeditiously deport criminal aliens." Reconsideration Order at 4–5.

Finally, the court reiterated its view that the consent of Sentamu in particular had given the INS substantial assistance:

> Sentamu did not merely agree to consent to his own deportation. Rather, Sentamu's agreement to consent to his own deportation led to the entry of a final administrative order of deportation before his sentencing, thereby relieving the INS of the burden of initiating and completing the lengthy deportation process and allowing the agency to devote the scarce resources, time, and effort that it would otherwise have been required to expend on Sentamu to the detention and deportation of other criminal aliens. Because a final order of deportation was entered against Sentamu before the imposition of his sentence, the INS will not be required to use its limited detention space to detain Sentamu after his term of incarceration ends.

*Id.* at 5. The court therefore adhered to its conclusion that Sentamu's consent to deportation constituted an atypical circumstance warranting a downward departure under Guidelines § 5K2.0.

A judgment of conviction was entered sentencing Sentamu principally to 27 months' imprisonment, albeit stating inaccurately that the district court had determined that the "Guideline Range" was "27 months to 33 months," that "[t]he sentence is within the guideline range," and that "the court finds no reason to depart from the sentence called for by application of the guidelines." (Judgment dated May 18, 1999 ("Judgment"), at 4.) The government has appealed, as permitted under 18 U.S.C. §§ 3742(b)(2) or (3) (1994) (permitting appeal by the government where sentence "was imposed as a result of an incorrect application of the sentencing guidelines" or "is less than … the sentence specified in the applicable guideline range").

## II. DISCUSSION

█ On appeal, the government contends that our decision in *Galvez–Falconi*

definitively ruled that a defendant's consent to deportation is not a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission, except where the defendant has presented a colorable, nonfrivolous defense to deportation. It argues that Sentamu is not within that exception because he proffered no defense whatever to deportation. Sentamu argues that *Galvez–Falconi* is distinguishable because Galvez–Falconi was convicted of illegally reentering the United States after having been deported and was thus subject to deportation without the institution of new proceedings, whereas Sentamu has never before been deported. He also argues that, under the Supreme Court's decision in *Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), the district court's decision to depart is entitled to substantial deference. For the reasons that follow, we reject Sentamu's contention as to the standard of review applicable to this case, and we conclude that *Galvez–Falconi* is applicable here.

■■■ It is common ground that the Guidelines, promulgated pursuant to the Sentencing Reform Act of 1984, were intended, consistent with the statutory purposes of sentencing, to reduce "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct," 28 U.S.C. § 991(b)(1)(B) (1994). *See generally Koon,* 518 U.S. at 92, 116 S.Ct. 2035. Departures from the prescribed Guidelines ranges are allowed only in cases that are unusual. *See, e.g., id.* at 93–96, 98, 110, 116 S.Ct. 2035; Guidelines Ch. 1, pt. A, subpt. 4(b). In order to determine whether a case is unusual, the court must begin by asking "[w]hat features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case?" *Koon,* 518 U.S. at 95, 116 S.Ct. 2035 (internal quotation marks omitted). Answering this question requires a factu-

al analysis of the defendant's own characteristics and circumstances:

> Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing. Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guidelines cases.

*Koon,* 518 U.S. at 98, 116 S.Ct. 2035; *see also id.* at 100, 116 S.Ct. 2035 ("What the district court must determine is whether the misconduct that occurred *in the particular instance* suffices to make the case *atypical.* The answer is apt to vary depending on, for instance, the severity of the misconduct, its timing, and the disruption it causes. *These considerations are factual matters.*"); *id.* at 99–100, 116 S.Ct. 2035 ("The relevant question ... is ... whether the particular factor is within the heartland given all the facts of the case.").

■ In the present case, the court based its departure on § 5K2.0 of the Guidelines, which provides, in part, that

> the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described,"

Guidelines § 5K2.0 (Policy Statement) (quoting 18 U.S.C. § 3553(b)). As discussed at greater length in *United States v. Bonnet–Grullon,* Nos. 99–1321(L), 99–1325, also decided today, § 5K2.0 goes on

to reiterate that the court may depart from the applicable guideline if it determines that the Commission has not given a particular factor adequate consideration "in light of unusual circumstances," or if an offender's characteristic or other circumstance is present "to an unusual degree and distinguishes the case from the 'heartland' cases covered by the guidelines," Guidelines § 5K2.0 (Policy Statement), but not otherwise, *see United States v. Bonnet–Grullon*, 212 F.3d 692 (2d Cir.2000).

In the absence of a characteristic or circumstance that distinguishes a case as sufficiently atypical to warrant a sentence different from that called for under the guidelines, a sentence outside the guideline range is not authorized. *See* 18 U.S.C. § 3553(b).

Guidelines § 5K2.0 Commentary. If there is no guideline or commentary directly addressing a proposed ground for departure, the court must examine the "structure and theory of [the] relevant individual guidelines and the Guidelines taken as a whole," in order to determine whether the proffered ground makes the case sufficiently atypical to remove it from the "heartland." *Koon*, 518 U.S. at 96, 116 S.Ct. 2035. "The court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be 'highly infrequent.'" *Id.* (quoting Guidelines Ch. 1, pt. A, subpt. 4(b)).

 The decision of a sentencing court to depart is reviewable under an abuse-of-discretion standard. *See Koon*, 518 U.S. at 100, 116 S.Ct. 2035. The *Koon* Court adopted that standard because departures are to be based on a close analysis of the defendant's individual characteristics and circumstances, meaning that "a district court's departure decision involves the consideration of unique factors that are little susceptible . . . of useful generalization," *id.* at 99, 116 S.Ct. 2035 (internal quotation marks omitted). When the question is whether a defendant's individual characteristics and circumstances take

him out of the heartland of cases covered by the applicable guideline, "[d]istrict courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do." *Id.* at 98, 116 S.Ct. 2035. Reviewable for abuse of discretion, however, does not mean unreviewable. "The abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *Id.* at 100, 116 S.Ct. 2035. The question of "whether a factor is a permissible basis for departure under any circumstances is a question of law," and a "district court by definition abuses its discretion when it makes an error of law." *Id.; see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). "[T]he court of appeals need not defer to the district court's resolution of the point." *Koon*, 518 U.S. at 100, 116 S.Ct. 2035. Further, as demonstrated by *Koon*, the district court's decision to depart may be overturned where the factor relied on by the district court, in light of the circumstances, "is not unusual." *Id.* at 110, 116 S.Ct. 2035.

The issue of whether the mere fact of consent to deportation is sufficiently unusual to permit a downward departure was addressed by this Court in *Galvez–Falconi*, which agreed with the decision of the First Circuit in *United States v. Clase–Espinal*, 115 F.3d 1054 (1st Cir.), *cert. denied*, 522 U.S. 957, 118 S.Ct. 384, 139 L.Ed.2d 299 (1997), that it is not. In *Clase–Espinal*, having discussed the standards under which the permissibility of a departure is to be judged, the court held that

an alien criminal defendant with no plausible basis for contesting deportation—particularly one convicted of illegal reentry subsequent to deportation for an aggravated felony—does not meet the atypicality requirement for a section 5K2.0 departure simply by relying upon whatever administrative convenience

presumably may result from a stipulated deportation.

115 F.3d at 1058. The court stated that, although departure for consent to deportation is "not expressly forbidden, discouraged, or encouraged by the Sentencing Guidelines," that basis, standing alone, was "insufficient, as a matter of law, to warrant a downward departure." *Id.* at 1057. The *Clase–Espinal* court noted, *inter alia*, that the vast majority of illegal aliens expelled from the United States are deported without ever undergoing formal deportation proceedings. *See id.* at 1058 n. 4 ("97.5% of all illegal aliens are deported from the United States voluntarily with no formal adjudication of status by the [INS]. Indeed, the data consistently indicate that *only about 3% of all apprehended aliens* who are expelled ever undergo a deportation hearing" (emphasis added)); *see also United States v. Restrepo,* 999 F.2d 640, 647 (2d Cir.) ("[I]t is difficult to believe that the Commission was not conscious that a large number of defendants sentenced in the federal courts are aliens. For example, in 1991, approximately 23 percent of the defendants sentenced under the Guidelines were aliens."), *cert. denied,* 510 U.S. 954, 114 S.Ct. 405, 126 L.Ed.2d 352 (1993). The *Clase–Espinal* court also reasoned that various guideline references to defendants who had been "deported (voluntarily or involuntarily)," *e.g.,* Guidelines § 2L2.2(b)(1), showed that the Commission was fully aware that a significant number of aliens are removed from the United States without going through formal deportation proceedings.

The First Circuit concluded that it was "exceedingly improbable that the Commission either overlooked stipulated expulsions altogether or regarded their facilitative value to be 'of a kind' warranting a downward departure." *Clase–Espinal,* 115 F.3d at 1058. The court "h[el]ld, at least in the absence of a colorable, nonfrivolous defense to deportation, that the proffered ground for departure under U.S.S.G. § 5K2.0 does not constitute a mitigating

circumstance of a kind not adequately considered by the Commission," 115 F.3d at 1059, and that in the absence of any "discernible defense to deportation," a stipulation to deportation does not confer on the INS an administrative benefit that could be considered a "mitigating circumstance 'to a degree' not adequately considered by the Commission," *id.*

In *Galvez–Falconi,* we agreed. Noting, *inter alia,* the statistic that "97 percent of all apprehended aliens are expelled without a deportation hearing[ ], making their assistance to the government in consenting to deportation of such limited value as to preclude a finding that the consent presents a mitigating circumstance of a kind not adequately considered by the Commission," 174 F.3d at 259–60 (internal quotation marks omitted), we stated:

> We agree with the First Circuit that a defendant seeking a departure under § 5K2.0 for consenting to deportation must present a colorable, nonfrivolous defense to deportation, such that the act of consenting to deportation carries with it unusual assistance to the administration of justice. In the absence of such a showing, the act of consenting to deportation, alone, would not constitute a "circumstance that distinguishes a case as sufficiently atypical to warrant" a downward departure. U.S.S.G. § 5K2.0,

*Galvez–Falconi,* 174 F.3d at 260.

Although Sentamu correctly points out that both *Clase–Espinal* and *Galvez–Falconi* involved defendants convicted of illegally reentering the United States in violation of 8 U.S.C. § 1326, whereas Sentamu was convicted of the different offense of importation of narcotics, we conclude that the distinction, in the context of departure authority, is insignificant. In light of the fact that the overwhelming majority of all deported aliens are removed from the United States without formal proceedings, Sentamu's stipulation to deportation hardly provides assistance that is unusual or makes his case atypical; rather his consent to removal places him squarely within the

heartland of cases involving convicted aliens.

In sum, we conclude that this case, in which Sentamu was convicted of an offense other than illegal reentry, is governed by the principle announced in *Galvez–Falconi*. Without a proffer of some colorable, nonfrivolous defense to deportation, Sentamu's consent to deportation following the completion of his term of imprisonment is not a permissible basis for departure.

We disagree with the view of the district court that a departure for helping to ease the INS's administrative burdens is permissible by analogy to Guidelines § 5K1.1 (expressly authorizing departures for a defendant's assistance in the prosecution or investigation of other persons), or to cases such as *United States v. Agu*, 949 F.2d 63, 67 (2d Cir.1991) (noting the possibility that a defendant's cooperation with the government in contexts other than criminal prosecutions of other persons might warrant a departure "in appropriate circumstances"), *cert. denied*, 504 U.S. 942, 112 S.Ct. 2279, 119 L.Ed.2d 205 (1992), and *United States v. Khan*, 920 F.2d 1100, 1107 (2d Cir.1990) (noting that the defendant's saving the life of a federal agent might have supported a departure, but that the defendant failed to raise the issue at sentencing), *cert. denied*, 499 U.S. 969, 111 S.Ct. 1606, 113 L.Ed.2d 669 (1991). Since "97 percent of all apprehended aliens are expelled without a deportation hearing," *Galvez–Falconi*, 174 F.3d at 259, the district court's ground for departure plainly would have widespread applicability. Insofar as departures are permissible on the basis of factors not taken into account by the Commission, however, the Sentencing Reform Act authorizes only "individualized sentences." 28 U.S.C. § 991(b)(1)(B). Nothing in that Act, or in § 5K1.1, or in the cases suggests the permissibility of a departure on any basis other than one linked to the particular conduct, characteristics, or circumstances of the defendant under consideration.

Nor are we persuaded by the district court's view that a departure for Sentamu was justified by the "extensive factual record" presented here, Reconsideration Order at 4. The record did not indicate that Sentamu's own circumstances were unusual, or that the departure decision was based on the court's "vantage point and day-to-day experience in criminal sentencing," *Koon*, 518 U.S. at 98, 116 S.Ct. 2035. Nor did the district court's stated rationale suggest that Sentamu's circumstances were so atypical as to remove him from the heartland of cases involving aliens convicted of deportable offenses. Instead, the facts cited by the court suggested an institutional flaw in the interaction between the two Branches of government other than the Judiciary: an agency of the Executive Branch having certain duties imposed by the Legislative Branch, but unable to fulfill those duties because of "insufficient resources," Opinion at 28, provided by the Legislative Branch.

If in fact the INS lacks the funding to carry out its legislative mandate, that is a matter to be resolved between the Executive Branch and the Legislative Branch. We note that the "extensive factual record" on which the court relied for its finding of "substantial administrative problems which prevent the INS from complying with its statutory responsibilities to detain and expeditiously deport criminal aliens," Reconsideration Order at 4–5, consisted principally of a then-recent report of the General Accounting Office to a congressional committee. The very existence of that report suggests that the matter of the INS's compliance with its statutory duties is being addressed by the proper Branches.

Finally, we note that were we to uphold the departure granted to Sentamu as a means of addressing such an institutional gap between Legislative Branch command and Executive Branch compliance, one of two consequences would likely follow, neither of them consonant with the central purposes and theories of the Sentencing

Reform Act and the Guidelines. If all defendants who stipulate to deportation were routinely rewarded with downward departures, then departures would, inappropriately, become the rule rather than the exception. On the other hand, some judges might grant departures to such defendants while other judges elected as a matter of discretion not to depart; or some judges might grant smaller departures than others. These are categories of decisions that a defendant would not be entitled to appeal. *See, e.g., United States v. Hargrett,* 156 F.3d 447, 450 (2d Cir.), *cert. denied,* 525 U.S. 1048, 119 S.Ct. 607, 142 L.Ed.2d 547 (1998); *United States v. Lawal,* 17 F.3d 560, 563 (2d Cir.1994). If such variations were to occur, the ruling that such departures are in general permissible, unrelated to particular characteristics of the individual defendant or to any special feature of his case, would have undermined the goal of reducing unwarranted disparities in the sentences of similarly situated defendants.

## CONCLUSION

We have considered all of Sentamu's arguments in support of the departure granted by the district court and have found them to be without merit. The government asserts that Sentamu proffered no defense whatever to deportation, much less a colorable, nonfrivolous defense. Sentamu has not disputed that assertion, has not suggested that he has available any such defense, and has not requested any further opportunity to put forth such a defense in the event we found *Galvez–Falconi* controlling. Accordingly, we vacate the judgment of the district court and remand for resentencing within the Guidelines range.