Elvir ROSARIO–DOMINGUEZ,
Petitioner,

v.

UNITED STATES OF AMERICA,
Respondent.

No. 03 Civ.4675 JSR GWG.
No. 99 CR.73 AGS.

United States District Court,
S.D. New York.

Feb. 1, 2005.

Elvir Rosario-Dominguez, Lisbon, OH, pro se.

Edward Chang, Asst. U.S. Atty., New York, NY, for respondent

### ORDER

RAKOFF, District Judge.

By Order dated December 8, 2004, the Court re-opened the above-captioned matter to consider petitioner's objections to the Report and Recommendation of Magistrate Judge Gabriel W. Gorenstein dated September 27, 2004 ("Report"), which recommended that petitioner's petition under 28 U.S.C. § 2255 be denied and the case dismissed with prejudice, and asked respondent to submit answering papers. Accordingly, the Court has reviewed the petition and the underlying record de novo.

Having done so, the Court finds itself in complete agreement with Magistrate Judge Gorenstein's Report and hereby adopts its reasoning by reference. Accordingly, the Court dismisses the petition with prejudice. In addition, since the petitioner has not made a substantial showing of the denial of a constitutional right, the Court denies petitioner's request for a certificate of appealability under 28 U.S.C. § 2253(c)(2), and further certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from the Court's order would not be taken in good faith. Clerk to enter judgment.

SO ORDERED.

### REPORT AND RECOMMENDATION

GORENSTEIN, United States Magistrate Judge.

Elvir Rosario–Dominguez was convicted on December 19, 2000 of one count of conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). He was sentenced principally to a prison term of 210 months. The United States Court of Appeals for the Second Circuit affirmed the judgment of conviction on February 19, 2002. Rosario–Dominguez, who is currently in prison serving his sentence, has petitioned this Court pro se under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. For the reasons below, the petition should be denied.

## I. BACKGROUND

### A. Pretrial Procedural History

On June 24, 1999, Rosario–Dominguez and 14 other defendants were charged in an 18–count indictment with conspiracy to traffic in narcotics. *See* Indictment, undated ("Indictment") (reproduced at A–39 to A–58 of Appendix ("Appendix") (annexed to Declaration of Edward Chang, filed January 27, 2004 (Docket # 6) ("Chang Decl."))). Rosario–Dominguez was charged only in count one, which alleged his involvement between May 1998 and January 1999 in a conspiracy to "distribute and possess with intent to distribute 1 kilogram and more of mixtures and substances containing a detectable amount of heroin." *Id.* ¶¶ 1–5.

### B. Evidence at Trial

The late Judge Allen G. Schwartz presided over Rosario–Dominguez's trial, which took place in February 2000. Rosario–Dominguez and a co-defendant, Jose Urena, were tried together. Eleven other co-defendants pled guilty, one co-defendant died prior to the trial, and the other was a fugitive. *See* Brief for the United States of America in *United States v. Arroyo* (2d Cir. No. 00–1755(L)), dated November 2, 2001, at 2–3 n.*.

Eddy Sanchez, also known as "Chelo," a co-conspirator who had previously pled guilty, testified on behalf of the Government as a cooperating witness. (Sanchez: Tr. 404–05, 446–50).[1] Sanchez testified that he first met Rosario–Dominguez (also known as "Jabao") in July 1996 at a bodega on West 135th Street between Broadway and Amsterdam Avenue. (Sanchez: Tr. 406, 439, 450–51). Sanchez worked at

the bodega and lived nearby. (Sanchez: Tr. 439–40). He observed Rosario–Dominguez and Urena operating a retail heroin business in that vicinity. (Sanchez: Tr. 451–52). Specifically, Sanchez saw both Rosario–Dominguez and Urena dividing up bundles of heroin and giving them to their workers. (Sanchez: Tr. 452). According to Sanchez, Rosario–Dominguez and Urena employed eight or more workers to sell heroin to street customers. (Sanchez: Tr. 451, 455–57). Sanchez testified that people called Rosario–Dominguez "patron" or "boss" and he collected the money from the workers. (Sanchez: Tr. 455). Rosario–Dominguez and Urena operated two "spots" where they sold drugs—one in a park behind a school on West 136th Street and another in apartment buildings on West 135th Street—which were open seven days a week. (Sanchez: Tr. 457–59).

Sanchez testified that in December 1996 he left his job at the bodega and became involved in wholesale distribution of cocaine and heroin. (Sanchez: Tr. 440–41). Around March 1998, Sanchez received a large supply of heroin but did not have enough customers to whom to distribute it. (Sanchez: Tr. 460–61, 481). Sanchez approached Rosario–Dominguez, who agreed to purchase a quantity of heroin. (Sanchez: Tr. 483–85). Thereafter, Sanchez began periodically supplying Rosario–Dominguez with quantities of heroin ranging from 50 to 500 grams at a time. (Sanchez: Tr. 415–16, 489, 492–94, 501, 507–08, 526–29, 536–39). He recalled that he did so on seven or eight occasions. (*See* Sanchez: Tr. 415).

In November 1998, Rosario–Dominguez and Sanchez met in a telephone calling center on 136th Street and discussed

---

1. The trial transcript is reproduced at pages A–164 to A–1370 of the Appendix. All cites to the transcript contain page number citations corresponding with the page within the Appendix where the material may be found. Thus "404" refers to page A–404 of the Appendix.

Rosario–Dominguez's ability to "move" approximately 500 grams of heroin. (Sanchez: Tr. 536, 567–68). Rosario–Dominguez told Sanchez that he was running a "drug spot" on West 137th Street between Broadway and Riverside Drive. (Sanchez: Tr. 418, 537). Rosario–Dominguez stated that he was capable of selling between 500 and 1000 grams of heroin "at any time of the day" at the West 137th Street spot. (Sanchez: Tr. 537–38). Rosario–Dominguez assured Sanchez that he would have no problem selling that quantity within one or two days. (Sanchez: Tr. 539). Sanchez thereafter supplied Rosario–Dominguez with 500 grams of heroin but, as it turned out, Rosario–Dominguez had some difficulty selling it quickly. (Sanchez: Tr. 539–41).

The Government also introduced tapes of phone conversations intercepted pursuant to a court-authorized wiretap. These tapes included several conversations between Sanchez and Rosario–Dominguez regarding drug transactions in November 1998. Sanchez: Tr. 562–64, 568–70, 579–82; *see also* Transcript of Tape No. N1003–10, dated November 15, 1998 (annexed at A–1371 to A–1373 of Appendix); Transcript of Tape No. N1003–11, dated November 16, 1998 (annexed at A–1379 to A–1380 of Appendix); Transcript of Tape No. N1003–12, dated November 16, 1998 (annexed at A–1386 to A–1387 of Appendix); Transcript of Tape No. N1003–13, dated November 16, 1998 (annexed at A–1388 to A–1389 of Appendix).

The parties stipulated that in November 1998, several calls were placed from Rosario–Dominguez's home telephone (located at West 135th Street) to Sanchez's cellular telephone. (Tr. 1011).

The indictment contained allegations that Rosario–Dominguez discussed narcotics transactions with Sanchez over the telephone on December 8 and 10, 1998. *See* Indictment ¶ 5(tt), (zz). At trial, the Government did not introduce tapes of conversations on these dates. Through cross-examination, Rosario–Dominguez's defense counsel elicited testimony that these conversations in fact might have involved another individual also known as "Jabao." (Galbadis: Tr. 338–48; Sanchez: Tr. 814–20).

Rosario–Dominguez was arrested on April 27, 1999, after Sanchez identified him to agents from the Drug Enforcement Administration. (Galbadis: Tr. 262–63). Under questioning, Rosario–Dominguez told Agent Steven Galbadis that he had never sold drugs, that he did not know "Chelo" (Sanchez), that he had never spoken on the phone with a person named Chelo, and that he had never entered any heroin transactions with Chelo. (Galbadis: Tr. 268).

Between his arrest and trial, Rosario–Dominguez encountered Sanchez in the holding cells of the federal courthouse on two occasions. During the first encounter, on September 24, 1999, Rosario–Dominguez said to Sanchez, "If I can't catch you, I'm going to catch your children." (Sanchez: Tr. 664–66). The second time, in December 1999, Rosario–Dominguez said to Sanchez, "I'm going to stick it in you; not only that, I'm going to grab you so that someone else can stick it in you and then I'm going to do it after them." (Sanchez: Tr. 665–67).

Rosario–Dominguez did not present any witnesses or evidence.

### C. *The Jury Verdict and Sentencing*

Prior to the jury charge, a discussion was held on the record about whether it was necessary to submit a special verdict form to the jury to allow the jury to calculate the quantity of drugs involved in the

**506**

offenses. (Tr. 1148–51). Rosario–Dominguez's counsel waived any requirement that the jury make this determination out of concern that it "could extend deliberations and confuse [the jury]." (Tr. 1151).

On February 22, 2000, the jury returned a verdict finding Rosario–Dominguez guilty of one count of conspiracy to possess with intent to distribute and to distribute controlled substances. (Tr. 1367–68). Represented by new counsel, on December 19, 2000, Rosario–Dominguez was sentenced to 210 months in prison followed by a term of five years' supervised release. Sentencing Transcript, dated December 19, 2000 ("Sentencing Tr.") (annexed as part of Ex. A to Chang Decl.), at 23–24. In support of this sentence, the trial court found that the record established that Rosario–Dominguez was a manager or a supervisor in a conspiracy in which he distributed at least three kilograms of heroin. *Id.* at 22–23.

D. *Rosario–Dominguez's Direct Appeal*

Rosario–Dominguez appealed his conviction and sentence to the Court of Appeals for the Second Circuit. He first argued that pursuant to *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), which was decided after Rosario–Dominguez's trial but before sentencing, the trial court erred in failing to submit the issue of drug quantity to the jury. Brief and Appendix for Defendants–Appellants, dated September 13, 2001 ("Pet.App. Brief") (reproduced as Ex. A to Chang Decl.), at 12–14. Rosario–Dominguez also argued that the court failed to obtain his knowing and voluntary consent to not submitting the issue to the jury, that the court failed to make a specific finding as to drug quantity beyond a reasonable doubt, and that the evidence was insufficient to support the court's finding as to drug quanti-

ty. *Id.* at 14–15, 18–26. In addition, Rosario–Dominguez argued that his counsel was ineffective for waiving the requirement that the jury determine drug quantity without explaining the ramifications of such a waiver to his client. *Id.* at 15–18. Rosario–Dominguez's final argument on appeal was that the court erred in enhancing his sentence based on his role in the offense. *Id.* at 26–27.

The Second Circuit issued an unpublished summary order affirming Rosario–Dominguez's conviction and sentence. *United States v. Arroyo,* 31 Fed.Appx. 9, 2002 WL 243634 (2d Cir. Feb.19, 2002). The court held that any *Apprendi*-related error was harmless because Rosario–Dominguez was not sentenced to a term of imprisonment over the statutory maximum, which is 240 months under 21 U.S.C. § 841(b)(1)(C). *Id.* at 12. The court also found no grounds to support Rosario–Dominguez's contention that his trial counsel was ineffective and held that the trial court did not err in applying an enhancement for Rosario–Dominguez's role in the offense. *Id.* at 13.

The Supreme Court denied certiorari on June 10, 2002. *Rosario v. United States,* 536 U.S. 911, 122 S.Ct. 2372, 153 L.Ed.2d 192 (2002).

E. *The Instant Habeas Petition*

The instant habeas petition is dated June 8, 2003 and was mailed in an envelope postmarked June 9, 2003. *See* Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, filed June 25, 2003 (Docket # 1). Under the "prison mailbox" rule, a petition for writ of habeas corpus is deemed filed on the day a *pro se* prisoner gives it to prison officials for mailing to the court clerk. *Noble v. Kelly,* 246 F.3d 93, 97–98 (2d Cir.), *cert. denied,* 534 U.S. 886, 122 S.Ct. 197, 151 L.Ed.2d 139 (2001).

Based on this rule, the motion meets the one-year limitations period contained in 28 U.S.C. § 2255. *See, e.g., Moreno–Castillo v. United States,* 2003 WL 23109747, at *1 n. 1 (S.D.N.Y. Dec.31, 2003) (§ 2255 motion deemed filed on the date the envelope was postmarked).

Rosario–Dominguez has submitted a memorandum of law asserting ten grounds for relief. *See* Memorandum of Law in Support of Petitioner's Section 2255 Motion, filed July 31, 2003 (Docket # 228 in 99 Cr. 73) ("Pet.Mem."), at 1. The asserted grounds for relief are as follows:

> (1) The government violated [Fed. R.Evid.] 404(b) and misled the Court; (2) Counsel failed to raise a viable defense theory; (3) Counsel was ineffective when he failed to challenge the validity of the indictment; (4) Counsel failed to effectively challenge the District Court's attributable drug quantity calculation; (5) Counsel failed to effectively challenge Eddy Sanchez['s] veracity; (6) Counsel failed to raise a viable ground for departure; (7) Counsel failed to disclose a plea offer; (8) The District Court erred in its enhancement, under [United States Sentencing Guidelines ("U.S.S.G.")] § 3B1.1; (9) Counsel refused to allow Petitioner to testify; and (10) Counsel failed to investigate and present the testimony of a readily available witness.

*Id.*

In support of his petition, Rosario–Dominguez submitted an affidavit of Pablo Perron, the owner of a bodega on 135th Street between Broadway and Amsterdam Avenue, stating in essence that Sanchez did not work at his bodega. *See* Affidavit [in] Support of Urena and Rosario's Assertion that Sanchez Has Never Worked in My Bodega Located at 135th Street Between Broadway and Amsterdam, dated June 23, 2003 ("Perron Aff.") (annexed as Attach.

A to Pet. Mem.), ¶ 4. Rosario–Dominguez has also submitted his own affidavit stating that Perron had been available to testify at his trial, that Perron so told trial counsel, that trial counsel refused to accede to Rosario–Dominguez's own request to testify, and that trial counsel failed to inform him of a plea offer. Affidavit of Elvir Rosario–Dominguez, dated July 25, 2003 ("Pet. Aff.") (annexed to Pet. Mem.), ¶¶ 4–9.

## II. *APPLICABLE LEGAL PRINCIPLES*

### A. *Law Governing Petitions Under 28 U.S.C. § 2255*

28 U.S.C. § 2255 provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

Relief under § 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in [a] complete miscarriage of justice." *Graziano v. United States,* 83 F.3d 587, 590 (2d Cir. 1996) (per curiam) (internal quotation marks and citation omitted).

In considering a § 2255 petition, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect

thereto." 28 U.S.C. § 2255. However, even when a hearing may be warranted, " 'the statute itself recognizes that there are times when allegations of facts outside the record can be fully investigated without requiring the personal presence of the prisoner.' " *Chang v. United States,* 250 F.3d 79, 85 (2d Cir.2001) (quoting *Machibroda v. United States,* 368 U.S. 487, 495, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962)); *see* 28 U.S.C. § 2255 ("A court may entertain and determine such motion without requiring the production of the prisoner at the hearing."). Depending on the allegations in the petition, a "court may use methods under [§ ] 2255 to expand the record without conducting a full-blown testimonial hearing." *Chang,* 250 F.3d at 86 (citing *Blackledge v. Allison,* 431 U.S. 63, 81–82, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977)). Potential methods available to a court to supplement the record include " 'letters, documentary evidence, and, in an appropriate case, even affidavits.' " *Id.* (quoting *Raines v. United States,* 423 F.2d 526, 529–30 (4th Cir.1970)).

It is well established that § 2255 "may not be employed to relitigate questions which were raised and considered on direct appeal." *Barton v. United States,* 791 F.2d 265, 267 (2d Cir.1986) (per curiam); *accord United States v. Sanin,* 252 F.3d 79, 83 (2d Cir.) (per curiam) (citing cases), *cert. denied,* 534 U.S. 1008, 122 S.Ct. 492, 151 L.Ed.2d 403 (2001). " 'Reconsideration is permitted only where there has been an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal.' " *Sanin,* 252 F.3d at 83 (quoting *Chin v. United States,* 622 F.2d 1090, 1092 (2d Cir.1980), *cert. denied,* 450 U.S. 923, 101 S.Ct. 1375, 67 L.Ed.2d 353 (1981)); *see also United States v. Frady,* 456 U.S. 152, 164–65, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) ("Once the defendant's chance to

appeal has been waived or exhausted ... we are entitled to presume he stands fairly and finally convicted, especially when ... he already has had a fair opportunity to present his federal claims to a federal forum.... [A] final judgment commands respect.").

### B. *Law Governing Procedural Default*

 If a habeas petitioner fails to assert a claim on direct review, the claim will be considered procedurally defaulted—and thus ineligible for review—in a subsequent proceeding under § 2255, unless the petitioner "can first demonstrate either 'cause' [for the default] and actual 'prejudice' or that he is 'actually innocent.' " *Bousley v. United States,* 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (citations omitted); *accord Frady,* 456 U.S. at 167–68, 102 S.Ct. 1584; *DeJesus v. United States,* 161 F.3d 99, 102 (2d Cir.1998). To satisfy the "cause" requirement, the petitioner must show circumstances " '*external* to the petitioner, something that cannot be fairly attributed to him.' " *Marone v. United States,* 10 F.3d 65, 67 (2d Cir.1993) (per curiam) (quoting *Coleman v. Thompson,* 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (emphasis in original)). Attorney error or ignorance does not amount to "cause" for a procedural default unless the error rises to the level of constitutional ineffectiveness. *Coleman,* 501 U.S. at 752–55, 111 S.Ct. 2546; *accord United States v. Pipitone,* 67 F.3d 34, 38–39 (2d Cir.1995) (defense counsel's ignorance of existing legal authority does not amount to "cause" for failure to appeal a sentence). The resulting "prejudice" must create an "*actual* and substantial disadvantage, infecting [the petitioner's] entire trial with error of constitutional dimensions." *Frady,* 456 U.S. at 170, 102 S.Ct. 1584 (emphasis in original). Finally, "[t]o establish actual innocence, [the] petitioner

must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley,* 523 U.S. at 623, 118 S.Ct. 1604 (internal quotation marks and citations omitted).

An exception to the procedural default rule exists for claims of ineffective assistance of counsel. In *Massaro v. United States,* 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003), the Supreme Court held that "an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal."

C. *Law Governing Ineffective Assistance of Counsel Claims*

"In order to prove ineffective assistance, [a petitioner] must show (1) 'that counsel's representation fell below an objective standard of reasonableness'; and (2) 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Pham v. United States,* 317 F.3d 178, 182 (2d Cir.2003) (quoting *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)); *see Massaro,* 538 U.S. at 505 ("[A] defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial.").

In evaluating the first prong—whether counsel's performance fell below an objective standard of reasonableness—" '[j]udicial scrutiny ... must be highly deferential' " and the petitioner must overcome

the " 'presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' " *Bell v. Cone,* 535 U.S. 685, 698, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052); *see Dunham v. Travis,* 313 F.3d 724, 730 (2d Cir.2002) (according counsel a presumption of competence). Concerning the second prong—whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different—the Second Circuit generally "requires some objective evidence other than defendant's assertions to establish prejudice." *Pham,* 317 F.3d at 182 (citing *United States v. Gordon,* 156 F.3d 376, 380–81 (2d Cir.1998) (per curiam)).

III. *DISCUSSION*

A. *Rosario–Dominguez's Claims of Trial and Sentencing Errors*

Rosario–Dominguez has two claims that are not based on ineffective assistance of counsel. Specifically, he asserts that (1) introduction of evidence from Sanchez regarding narcotics sales in 1996—prior to the date of the charged conspiracy—violated Fed.R.Evid. 404(b), Pet. Mem. at 2–6; *see also* Petitioner's Reply to Respondent's Opposition to the Petitioner's Section 2255 Motion and Memorandum of Law in Support Thereof, filed April 7, 2004 (Docket #9) ("Pet.Reply"), at 8–10; and (2) the court erred in enhancing his sentence under U.S.S.G. § 3B1.1(b) for serving as a manager of the drug conspiracy, Pet. Mem. at 33–36; *see also* Pet. Reply at 23–25.[2]

2. The Government has construed each of Rosario–Dominguez's ineffective assistance of counsel claims as also raising the underlying issue as a ground for relief on the merits. *See* Memorandum of Law in Opposition to Petitioner's Motion for Relief Under 28 U.S.C.

§ 2255, filed January 27, 2004 (Docket #5), at 6. It hardly seems necessary to so broadly construe Rosario–Dominguez's petition, however, inasmuch as Rosario–Dominguez's submissions show that he is able to differentiate between claims on the merits and those based

### 1. *The Rule 404(b) Claim*

The content of Rosario–Dominguez's Rule 404(b) claim is somewhat confusing but appears to consist of two different strands. The first is that the Rule 404(b) evidence—that is, evidence regarding the 1996 narcotics sales—should not have been permitted at all. This strand is easily disposed of, however, as it was not raised on appeal and is thus procedurally defaulted. Rosario–Dominguez offers no "cause" for the failure to raise it nor does he offer any evidence of "actual innocence."

The second strand of his argument is that the Rule 404(b) evidence itself was suspect because it relied on testimony of Sanchez, who allegedly lied when he asserted that he had worked at the bodega on 135th Street. Specifically, Rosario–Dominguez points to the recent affidavit submitted by Perron, in which Perron states that he owned a bodega located on 135th Street between Broadway and Amsterdam Avenue and that Sanchez did not work there in 1996 or at any other time, Perron Aff. ¶ 4. Pet. Mem. at 3–4; Pet. Reply at 8. Rosario–Dominguez offers this fact to contradict Sanchez's testimony at trial that he came to know of Rosario–Dominguez and his involvement in drug activity while working at the bodega (*see* Sanchez: Tr. 439–40, 450–52, 455–57). Perron states that he informed "at least one of the defendant's lawyers" that he was available to testify at trial. Perron Aff. ¶ 5. He also states that he is "currently available" to be examined under oath regarding his affidavit, although he failed to fill in a blank line intended for his address. *Id.* ¶ 6. In addition, Rosario–Dominguez has submitted his own affidavit

stating that "Perron contacted counsels notifying them of his availability to testify" and that "counsel advised me he was going to contact Mr. Perron, but he never did." Pet. Aff. ¶¶ 5–6.

▄▄▄ The first question that arises with respect to this claim is whether the Perron affidavit is sufficient to overcome the procedural default that arose when the Rule 404(b) claim was not raised on appeal. While case law permits the offering of "new evidence" to justify what would otherwise constitute a procedural default, the Second Circuit has made clear that " 'new evidence' in § 2255 proceedings ... is evidence that is discovered after the original hearing, and which could not, with due diligence of counsel, have been discovered sooner." *Giacalone v. United States,* 739 F.2d 40, 43 (2d Cir.1984) (collecting cases); *accord Moreno–Ortiz v. United States,* 983 F.2d 15, 16 (2d Cir.1993); *Prihar v. United States,* 83 F.Supp.2d 393, 399 (S.D.N.Y.2000), *aff'd,* 10 Fed.Appx. 4, 2001 WL 468121 (2d Cir. May 1, 2001), *cert. denied,* 534 U.S. 935, 122 S.Ct. 304, 151 L.Ed.2d 225 (2001). In addition, the evidence must be " 'material, not cumulative, and ... probably lead to an acquittal.' " *Moreno–Ortiz,* 983 F.2d at 16–17 (quoting *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir.1980)); *see United States v. Spencer,* 4 F.3d 115, 119 (2d Cir.1993). New evidence "which merely discredits a government witness and does not directly contradict the government's case ordinarily does not justify the grant of a new trial." *United States v. Sposato,* 446 F.2d 779, 781–82 (2d Cir.1971) (collecting cases); *accord Romero v. United States,* 28 F.3d 267, 269 (2d Cir.1994) (per curiam); *Har-*

on ineffective assistance of counsel. In any event, any claims on the merits that underlie the ineffective assistance claims were not raised on appeal and because no cause—other than ineffective assistance of counsel itself—

has been provided for the failure to raise them and because Rosario–Dominguez has not made a showing of actual innocence, the underlying claims are procedurally barred. *See* Section II.B above.

*ris v. United States,* 999 F.Supp. 578, 581 (S.D.N.Y.1998).

Taking the statements made by Perron in his affidavit as true, nothing in his affidavit indicates that Rosario–Dominguez is entitled to habeas review of his Rule 404(b) claim. Rosario–Dominguez's contention that the facts Perron offers are "new," *see* Pet. Reply at 4–5, is belied by his own statement that Perron was "readily available and [was] identified [to defense counsel] prior to trial," Pet. Mem. at 39; *see also* Pet. Aff. ¶ 5 (affirming that Perron informed counsel that he was available to testify). More fundamentally, it is clear from the face of the affidavit that the one new fact contained therein—specifically that Sanchez did not work at the bodega in 1996, Perron Aff. ¶ 4—is insufficient to support a conclusion that Rosario–Dominguez "probably" would be acquitted, *Moreno–Ortiz,* 983 F.2d at 16–17. The fact that Sanchez worked at the bodega was entirely peripheral to the evidence at trial and even peripheral to the Rule 404(b) evidence. Whether or not Sanchez was actually employed by the bodega could not reasonable be seen to have affected Sanchez's testimony that he met Rosario–Dominguez in 1996, had numerous contacts and conversations with him, and observed him participating in numerous drug-related transactions—testimony that was partially corroborated by telephone records indicating that Rosario–Dominguez had made telephone calls from his home to Sanchez's cellular phone (*see* Tr. 1011). Rather, Perron's affidavit constitutes a paradigmatic instance of testimony that "merely discredits a government witness and does not directly contradict the government's case," *Sposato,* 446 F.2d at 781. *See, e.g., Romero,* 28 F.3d at 269 (upholding trial court's determination that proof was sufficient to sustain conviction even assuming government witnesses could be thoroughly impeached by the new informa-

tion); *United States v. Gilbert,* 668 F.2d 94, 96 (2d Cir.1981) (evidence further impeaching credibility of a government witness whose character had already been shown to be questionable insufficient to affect jury's judgment), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982).

Moreover, the trial record in this case demonstrates that Sanchez's credibility was vigorously attacked by defense counsel throughout the trial on far more significant grounds. (*See, e.g.,* Tr. 1248–57). Sanchez testified that he had entered into a plea agreement with the Government in exchange for his testimony (*e.g.,* Sanchez: Tr. 404–05, 446–50); he also testified as to his extensive criminal record and involvement in international drug trafficking (*e.g.,* Sanchez: Tr. 427–47). Even Sanchez's testimony regarding drug transactions in 1996 was admitted only for the limited purpose of showing the background of the conspiracy and the relationship between the various participants under Fed.R.Evid. 404(b). (*See* Tr. 416–18, 452–54 (trial court's limiting instructions)).

Thus, Rosario–Dominguez has not shown either "cause" for his failure to present his Rule 404(b) claim in his direct appeal or "prejudice." Nor has Rosario–Dominguez made any showing of actual innocence to excuse the procedural default. Thus, his first ground for habeas relief was procedurally defaulted and habeas review is unavailable. Rosario–Dominguez's separate contention that trial counsel erred in failing to call Perron as a witness is discussed in section III.B.8 below.

### 2. The Section 3B1.1 Claim

■ Rosario–Dominguez argues that Perron's affidavit shows that the trial court improperly enhanced his sentence for his role in the offense since that en-

hancement relied on Sanchez's testimony. *See* Pet. Mem. at 33–36; Pet. Reply at 34. The sentencing enhancement, however, was raised on direct appeal and decided on the merits in favor of the Government. *See Arroyo*, 31 Fed.Appx. at 12–13. Thus, it may be reconsidered only if there has been "an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal," *Sanin*, 252 F.3d at 83. Rosario–Dominguez concedes that he has not "identif[ied] any intervening change in the law" that would allow this claim to be reviewed by this Court. Pet. Reply at 4.[3]

Instead, he offers only the Perron affidavit to show that his sentence was improperly calculated. Assuming *arguendo* that "new evidence" could permissibly be considered to relitigate a sentence that had already been challenged on direct appeal, *see Giacalone*, 739 F.2d at 43 (requiring new evidence before allowing relitigation on habeas of a claim that was previously decided on direct appeal); *but see Herrera v. Collins*, 506 U.S. 390, 400–04, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (newly discovered evidence of actual innocence not basis for habeas relief for state prisoner absent independent constitutional violation), the evidence from Perron was not "new" in that it was available to trial counsel, by Rosario–Dominguez's own admission, *see* Pet. Mem. at 39; Pet. Aff. ¶ 5. Second, and more significantly, the sentencing court's conclusion that Rosario–Dominguez was a "manager or supervisor ... in an offense in which there were more than five participants," Sentencing Tr. at 23, did not depend on whether or not Sanchez was an employee at the bodega in 1996.

## B. *Rosario–Dominguez's Claims of Ineffective Assistance of Counsel*

As outlined above, Rosario–Dominguez's petition raises eight separate claims of ineffective assistance of counsel. He asserts that he is entitled to relief because his trial counsel—John Burke, Esq.—failed to present a viable defense, failed to challenge the validity of the indictment, failed to effectively challenge Sanchez's veracity, failed to raise a viable ground for departure, refused to allow Rosario–Dominguez to testify, failed to pursue plea negotiations and to disclose a plea offer, and failed to investigate and present an available defense witness. *See* Pet. Mem. at 1. He also asserts that his counsel at sentencing—Alan Seidler, Esq.—failed to effectively challenge the court's calculation of drug quantity. *See id.*

**3.** Rosario–Dominguez recently wrote to the Court urging that *Blakely v. Washington*, — U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), requires vacatur of his sentence. *See* Letter to the Hon. Gabriel W. Gorenstein from Elvir Rosario–Dominguez, dated July 18, 2004. The Government has opposed that application. *See* Letter to the Hon. Gabriel W. Gorenstein from Edward Chang, dated August 13, 2004. Rosario–Dominguez's argument must be rejected because the Second Circuit has made plain that this Court must not construe *Blakely* as invalidating the federal sentencing guidelines until the Supreme Court rules otherwise. *See United States v. Mincey*, 380 F.3d 102, 105–06 (2d Cir.2004).

In any event, it would appear that even if *Blakely* invalidates the federal Sentencing Guidelines or their application in this case, the rule announced in *Blakely* would not permit Rosario–Dominguez to challenge his sentence on collateral review because the *Blakely* rule merely "allocate[s] decisionmaking authority" with respect to sentencing, *Schriro v. Summerlin*, — U.S. ——, ——, 124 S.Ct. 2519, 2523, 159 L.Ed.2d 442 (2004), and thus is not a new substantive rule that may upset a judgment of conviction on collateral review. *See United States v. Stoltz*, 2004 WL 1619131, at *2–*3 (D.Minn. July 19, 2004); *Garcia v. United States*, 2004 WL 1752588, at *5–*6 (N.D.N.Y. August 4, 2004).

None of these claims were raised on direct appeal. *See* Pet.App. Brief at 15–18 (arguing on appeal only that trial counsel was ineffective in waiving a jury finding as to drug quantity); *see also* Pet. Mem. at 25 (arguing that the instant claim regarding counsel's failure to challenge the court's calculation of drug quantity differs from the ineffective assistance claim raised on direct appeal). Under *Massaro*, all of Rosario–Dominguez's ineffective assistance of counsel claims are appropriately raised for the first time in this petition. *See* 538 U.S. at 504, 123 S.Ct. 1690. Each will be addressed in turn.

### 1. *Failure to Present a Viable Defense*

■ Rosario–Dominguez argues that Burke's performance was deficient because he failed to present two "viable" defense theories: (1) that there was actually no conspiracy, but rather a mere buyer-seller relationship between him and Sanchez "at best," Pet. Mem. at 6–11; *see also* Pet. Reply at 10–12; and (2) that there were multiple independent conspiracies rather than a single overall conspiracy as was charged in the indictment, Pet. Mem. at 11–14; *see also* Pet. Reply at 12–13. Rosario–Dominguez asserts that had defense counsel pursued these lines of defense, the court would have instructed the jury with respect to these issues and the "jury may not have convicted" him. Pet. Mem. at 11, 13.

There are at least two defects in this argument. First, as already described, there was more than sufficient evidence in this case for a jury to conclude that Rosario–Dominguez entered into an agreement with Sanchez to makes sales of heroin. It thus would have been useless for defense counsel to have argued to the jury that— regardless of whether this evidence was true—there was no agreement at all with Sanchez or that there was some other

independent conspiracy that did not involve Rosario–Dominguez. The second defect in this argument is that the mere existence of a potential alternative defense theory is not enough to establish ineffective assistance based on counsel's failure to present that theory. *See, e.g., United States v. Diaz,* 176 F.3d 52, 113 (2d Cir.) (counsel's failure to present diminished capacity defense did not constitute ineffective assistance), *cert. denied,* 528 U.S. 875, 120 S.Ct. 314, 145 L.Ed.2d 153 (1999). Here, Burke chose to argue that Rosario–Dominguez did not actually commit the crimes charged. (*See generally* Tr. 1246–69). In arguing that the evidence against Rosario–Dominguez was insufficient, Burke focused on attacking the credibility of the Government's principal witness. (*See* Tr. 1248–57). Burke's strategy was supported by some evidence that Rosario–Dominguez may have been misidentified as the speaker in several intercepted conversations (*see* Galbadis: Tr. 338–48; Sanchez: Tr. 814–20) and the argument that, as a cooperating witness, Sanchez lacked credibility (*see* Tr. 1249–54). In these circumstances, defense counsel's decision to pursue a legal innocence defense, rather than the less-compelling alternatives urged by Rosario–Dominguez, is purely a matter of sound trial strategy, *see Bell,* 535 U.S. at 698, 122 S.Ct. 1843, and cannot support a claim of constitutional ineffectiveness.

### 2. *Failure to Challenge the Validity of the Indictment*

Rosario–Dominguez argues that Burke was ineffective in failing to move to quash the indictment against him. Pet. Mem. at 14–18; *see also* Pet. Reply at 13–16. Rosario–Dominguez's presentation of this claim is difficult to follow but appears to be based on the fact that the only overt acts in furtherance of the conspiracy involving Rosario–Dominguez charged in the indictment were telephone conversations be-

tween him and Sanchez on December 8 and 10, 1998. *See* Pet. Mem. at 16–18; *see also* Indictment ¶ 5(tt), (zz). In support of this claim, Rosario–Dominguez has submitted the criminal complaint in this case. *See* Complaint, dated April 28, 1999 (reproduced as Attach. B· to Pet. Mem.). In the complaint, Agent Galbadis details the contents of calls allegedly participated in by Rosario–Dominguez on December 8, 9, and 10, 1998. *See id.* ¶ 8. As noted above, during trial, defense counsel elicited testimony that these conversations actually may have involved ·another individual also known as "Jabao." (Galbadis: Tr. 338–48; Sanchez: Tr. 814–20). Based on the claimed misidentification, Rosario–Dominguez argues that he was arrested without probable cause, *see* Pet. Mem. at 15–16, and, assuming that Agent Galbadis testi-· fied as to these calls before the Grand Jury, that he was indicted based on knowingly false testimony, *see id.* at 16–18; Pet. Reply at 14–15.

 There are at least two defects in this claim. First, Rosario–Dominguez has provided no grounds for believing that counsel acted ineffectively because there is no basis for concluding that reasonable counsel would have made a motion to dismiss the indictment. An indictment, cannot be challenged on the ground that it is not supported by adequate or competent evidence. *See, e.g., Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956); *United States v. Alfonso,* 143 F.3d ·772, 777 (2d Cir. 1998). The dismissal of an indictment is warranted only in exceptional circumstances. *See, e.g., United States v. Brown,* 602 F.2d 1073, 1077 (2d Cir.) ("We have approved [the] extreme sanction [of dismissal of the indictment] only when the pattern of [prosecutorial] misconduct is widespread or continuous."), *cert. denied,* 444 U.S. 952, 100 S.Ct. 427,

62 L.Ed.2d 323 (1979). Generally, extreme acts of prosecutorial misconduct must be demonstrated before an indictment will be dismissed. *See, e.g., United States v. Williams,* 504 U.S. 36, 46–47, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (misconduct before the grand jury must amount to a violation of one of those "few, clear rules which were carefully drafted and approved by [the Supreme Court] and by Congress to ensure the integrity of the grand jury's functions" (internal quotation marks and citation omitted)); *United States v. Hogan,* 712 F.2d 757, · 761–62 (2d Cir.1983) (indictment dismissed where the prosecutor's "flagrant and unconscionable" acts included presentation to the grand jury of false testimony, extensive reliance on misleading and speculative hearsay, and unsupported allegations of other criminal conduct); *United States v. Vetere,* 663 F.Supp. 381, 386–87 (S.D.N.Y.1987) (indictment dismissed where· prosecutor made extensive use of false and misleading evidence before the grand jury regarding defendant's alleged criminal background); *cf.* ' *United States v. Feola,* 651 F.Supp. 1068, 1131 (S.D.N.Y.1987) (noting that *Hogan* should be limited to its "highly unusual facts" and should not be applied to cases where the prosecutor's alleged misconduct fell far short of the "flagrant and unconscionable" misconduct complained of in *Hogan* ), *aff'd,* 875 F.2d 857 (2d Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989). Here, assuming there was a misidentification of the speaker in the recorded telephone calls, counsel had no basis for arguing that this error would support the extraordinary remedy of dismissal of the indictment.

Second, the allegations regarding the telephone calls were not even necessary to the indictment because "[i]n order to establish a violation of 21 U.S.C. § 846 [the federal controlled substances conspiracy

statute], the Government need not prove the commission of any overt acts in furtherance of the conspiracy." *United States v. Shabani,* 513 U.S. 10, 15, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994); *accord United States v. Knuckles,* 581 F.2d 305, 311 (2d Cir.) (no variance between indictment and trial proof where indictment charged heroin-related overt act and evidence at trial established cocaine-related overt act because no overt act requirement in § 846), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978). Thus, even if there were some defect in the charging of the overt acts themselves, that defect would have had no bearing on the sufficiency of the indictment.

### 3. *Failure to Effectively Challenge the Court's Calculation of Drug Quantity*

The next claim of ineffective assistance is based on Seidler's failure to effectively challenge the court's calculation of drug quantity. Pet. Mem. at 18–26; *see also* Pet. Reply at 16–17. Rosario–Dominguez argues that the evidence as to the quantity of drugs attributable to him for sentencing purposes did not satisfy the specificity standard articulated in *United States v. Shonubi,* 103 F.3d 1085, 1089–90 (2d Cir. 1997) (calculation of drug quantity for sentencing purposes must be supported by "specific evidence" such as drug records, admissions, or live testimony), and that, as a result, an evidentiary hearing was necessary under *United States v. Fatico,* 579 F.2d 707 (2d Cir.1978), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980). Pet. Mem. at 18–26. He claims that Seidler was ineffective for failing to raise these issues prior to sentencing and on appeal. *Id.* at 26.

Rosario–Dominguez cannot establish ineffective assistance of counsel on this point because the record demonstrates that at the sentencing hearing Seidler did argue—albeit unsuccessfully—that the evidence did not support any attributable drug quantity determination above 865 grams. *See* Sentencing Tr. at 7, 11–12, 19–20. Counsel's performance cannot be found deficient for failing to make arguments that he did in fact make. Moreover, on direct appeal, Seidler raised the underlying substantive claims that the district court applied the wrong standard of proof and erred in its calculation. Pet.App. Brief at 18–26. Indeed, the Second Circuit specifically noted that "the evidence presented as to drug quantity was sufficient to support the court's findings and sentences." *Arroyo,* 31 Fed.Appx. at 12.

### 4. *Failure to Effectively Challenge Sanchez's Veracity*

Listing numerous instances where Sanchez's testimony was internally inconsistent or differed from information he had provided to the Government in other instances, Rosario–Dominguez asserts that Burke should have done a better job of cross-examining Sanchez. Pet. Mem. at 26–30; *see also* Pet. Reply at 17–18. He also maintains that the Government played some role in this "fundamental breakdown of the trial process" through its knowing use of Sanchez's "perjur[ed]" testimony. Pet. Mem. at 26–27, 29–30. Had Burke brought out all of Sanchez's "lies" during cross-examination, Rosario–Dominguez contends that "there is a reasonable probability that the scales may have tipped in favor of an acquittal." *Id.* at 26.

The Second Circuit has repeatedly held that "[d]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature." *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988); *accord Eze v. Senkowski,* 321

F.3d 110, 127 (2d Cir.2003) (" 'The conduct of examination and cross-examination is entrusted to the judgment of the lawyer ....' " (quoting *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998))); *see also United States v. Eisen*, 974 F.2d 246, 265 (2d Cir.1992) (no ineffective assistance based on failure to adequately impeach government witnesses where defense counsel vigorously cross-examined witnesses and could have reasonably concluded that further questioning on relatively unimportant matters would confuse or fatigue the jury), *cert. denied*, 507 U.S. 1029, 113 S.Ct. 1840, 123 L.Ed.2d 467 (1993).

Burke's cross-examination of Sanchez followed a lengthy cross-examination conducted by Urena's defense counsel. (*See* Sanchez: Tr. 682–779). Burke himself elicited testimony suggesting that (1) Sanchez had identified the wrong "Jabao" (Sanchez: Tr. 801–05, 814–21, 866); (2) Sanchez tended to blame his involvement with drugs and arrests for drug-related crimes on "bad luck" rather than taking responsibility for his actions (Sanchez: Tr. 807–11); (3) Sanchez had previously used fake identification documents and lied to law enforcement (Sanchez: Tr. 812–14, 821–24, 844–45); (4) Sanchez originally told Agent Galbadis that he had sold heroin to Rosario–Dominguez four times but testified that he had sold to him seven or eight times (Sanchez: Tr. 824–25); (5) Sanchez had previously threatened people with violence and may have threatened Rosario–Dominguez (Sanchez: Tr. 826–28, 831–35); and (6) Sanchez was motivated to cooperate with the Government and implicate others by a desire to avoid prison time and immigration charges (Sanchez: Tr. 836–45).

In comparison with the credibility and veracity issues raised during cross-examination, the "lies" Rosario–Dominguez complains were ignored are relatively insignifi-

cant. *See* Pet. Mem. at 28–29 (pointing out that Sanchez was inconsistent with respect to, *inter alia*, certain quantities involved in particular drug transactions, the location of the bodega, and what position he held when he apparently worked for Aero Peru). In light of Burke's extensive attempts to impeach Sanchez, he reasonably could have chosen—as a matter of strategy—to focus on major impeachment topics rather than isolated and immaterial inconsistencies in Sanchez's testimony. Certainly, the jury was more likely to be affected by testimony indicating that a witness had a motive to lie and a history of lying than by testimony indicating that the witness gave inconsistent details in certain instances. *See Eisen*, 974 F.2d at 265 (further questioning on relatively unimportant matters could confuse or fatigue the jury).

### 5. *Failure to Raise a Viable Ground for Departure*

■■■ Rosario–Dominguez's fifth claim of ineffective assistance is that counsel failed to argue that Rosario–Dominguez was eligible for a downward departure from the Sentencing Guidelines because of his consent to immediate deportation after completing his sentence. Pet. Mem. at 30–31; *see also* Pet. Reply at 19–20.

■■■ In *United States v. Galvez–Falconi*, 174 F.3d 255, 260 (2d Cir.1999), the Second Circuit held that a district court has the authority under section 5K2.0 of the Sentencing Guidelines to grant a downward departure where a defendant consents to deportation following completion of the sentence and "present[s] a colorable, nonfrivolous defense to deportation, such that the act of consenting to deportation carries with it unusual assistance to the administration of justice." In the absence of such a defense, no basis for a departure exists. *Id.; accord United States v. Sen-*

*tamu,* 212 F.3d 127, 137 (2d Cir.2000). In general, an alien who has been convicted of an aggravated felony is subject to automatic deportation and thus does not qualify for a downward departure based on consent to deportation. *Castro v. United States,* 2003 WL 22909150, at *6 (S.D.N.Y. Dec.10, 2003); *accord Cardona v. United States,* 2000 WL 1229886, at *3 (S.D.N.Y. Aug.29, 2000) ("As an aggravated felon, petitioner has no basis to contest his deportation ... and thus would not qualify for a downward departure.").

As a result of his conviction, Rosario–Dominguez became an aggravated felon, *see* 8 U.S.C. § 1101(a)(43)(B), and thus was subject to mandatory deportation, *see id.* § 1227(a)(2)(B)(i) (any alien convicted of violating or conspiring to violate the controlled substances statutes is deportable); *id.* § 1229b(a)(3), (b)(1)(C) (the Attorney General may not cancel the removal of any deportable alien who has been convicted of an aggravated felony). In *Sentamu,* the Second Circuit held that a defendant who had been convicted of importing heroin was ineligible for the section 5K2.0 departure because his consent to deportation "place[d] him squarely within the heartland of cases involving convicted aliens." 212 F.3d at 136–37. Rosario–Dominguez has not presented any colorable, nonfrivolous defense to deportation. In his initial papers, he presented only his "extensive ties to the United States of America" and "real equity" as the basis for a defense. Pet. Mem. at 31. In his reply papers, he added that he is a legal resident of the United States, that his wife and two children would suffer hardships without his support, particularly in the current economy, and that he may be subject to persecution in his home country based on his family's membership in an unspecified "socio-political group." Pet. Reply at 19–20. The fact that Rosario–Dominguez has family in the United States cannot serve as a colorable defense to deportation, as such a claim would provide "practically every prisoner awaiting deportation" with grounds for seeking a departure. *Agramonte–Rosario v. United States,* 2002 WL 31545848, at *4 (S.D.N.Y. Nov.14, 2002) (no colorable defense based on family ties and conditions of incarceration). "[T]hen downward departures would, inappropriately, become the rule rather than the exception." *Sentamu,* 212 F.3d at 138. To the extent Rosario–Dominguez is arguing that he would be eligible for asylum, this claim is meritless given that the asylum statute, 8 U.S.C. § 1158(b)(2), specifically excludes "alien[s] having been convicted ... of a particularly serious crime"—including any aggravated felony.

Because Rosario–Dominguez has no colorable, nonfrivolous defense to deportation following his sentence, his consent to deportation could not have provided the basis for a downward departure from the Sentencing Guidelines. *See Galvez–Falconi,* 174 F.3d at 260. In the absence of any reasonable basis upon which to argue that Rosario–Dominguez was eligible for a downward departure, counsel cannot be found ineffective for failing to make such an argument. *See Lopez v. United States,* 2002 WL 1471540, at *3 (E.D.N.Y. May 15, 2002) (no ineffective assistance where petitioner had no colorable defense to deportation); *United States v. Heron,* 1999 WL 509469, at *2–*3 (S.D.N.Y. July 19, 1999) ("Because [petitioner] was not entitled to a downward departure [based on consent to deportation], his attorney caused him no cognizable prejudice.").

### 6. *Refusal to Allow Rosario–Dominguez to Testify*

Rosario–Dominguez claims ineffective assistance on counsel based on counsel's alleged refusal to let him testify. Pet. Mem. at 36–38. In support of this claim, Rosario–Dominguez affirms, "I advised

counsel that I wanted to testify on my behalf, but counsel adamantly refused to allow me to exercise this constitutional right." Pet. Aff. ¶ 7. As for the substance of the testimony he would have given, Rosario–Dominguez offers his contentions that "Sanchez was an admitted liar, [was an] international drug trafficker, ... had an extensive criminal history, ... and had a personal interest in the outcome of Rosario's trial." Pet. Mem. at 37–38. In addition, Rosario–Dominguez states that he did not have a prior criminal history and that prior to Sanchez's identification of him, he was unknown to law enforcement. *Id.* at 37.

After reviewing Rosario–Dominguez's papers, this Court requested that Burke submit a supplemental affirmation responding to this and other claims of ineffective assistance of counsel. *See* Order, filed May 6, 2004 (Docket # 248 in 99 Cr. 73). Burke did so and, with respect to this issue, he wrote:

> I conferred with Rosario regarding testifying in Court. He agreed not to testify. The defense had brought out on cross examination that there were two men nicknamed "Jabao" on tape. One of those men was Rosario. Through cross examination and tapes the defense was able to argue to the jury that the Government had confused many of the "Jabao" attributions on the tapes and transcripts. Rosario's testimony would have permitted the jury to hear his voice and infer that he was the "Jabao" discussing narcotics on tape.

Affirmation of John Burke, Esq., filed May 18, 2004 (Docket # 10) ("Burke Affirm. II"), ¶ 4. In response, Rosario–Dominguez disputes Burke's account and maintains that "the only exchange was counsel chastising me about wanting to testify, stating that it was his practice to preclude defendants from testifying. He stated that if I persisted [in insisting on testifying], he

would abandon my defense." Response to Counsel's Affirmation, dated May 20, 2004 ("Pet.Aff.II"), ¶ 2.

In *Chang*, the Second Circuit specifically addressed a district court's obligation to hold a hearing on a § 2255 petition which alleged ineffective assistance based on counsel's refusal to allow a defendant in a criminal case to testify in his own defense. *See* 250 F.3d at 85–86. In that case, both the petitioner and his trial counsel submitted affidavits. *Id.* at 81. The petitioner's affidavit stated that counsel had "prohibited" him from testifying, that counsel did not inform him that the decision whether or not to testify was his to make, and that had he known his rights he would have testified at trial. *Id.* Counsel's affidavit contradicted these assertions. *Id.* at 81–82. The district court credited counsel's statements and discredited petitioner's without holding an evidentiary hearing. *Id.* at 82. The Second Circuit first found that petitioner's ineffective assistance claim was "not so clearly bereft of merit as to be subject to dismissal on its face" and thus that summary dismissal would have been inappropriate. *Id.* at 85. However, the court went on to hold that the record as supplemented by the affidavits was sufficient to support dismissal of the petition without holding a full-blown testimonial hearing. *Id.* at 85–86.

Similarly, in this case both Rosario–Dominguez and Burke have now submitted affidavits on the topic of their discussions regarding whether Rosario–Dominguez would testify. Without holding a testimonial hearing, it is clear based on the record before this Court that Rosario–Dominguez is not entitled to relief based on this claim. First, this situation is virtually identical to *Chang* in that Rosario–Dominguez's assertions regarding counsel's refusal to let him testify, *see* Pet. Aff. ¶ 7; Pet. Aff. II ¶ 2, are self-serving and uncorroborated and this Court credits counsel's detailed and

credible description of what occurred. A testimonial hearing "would add little or nothing to the written submissions." 250 F.3d at 86.

██ Second, even if Rosario–Dominguez's assertions were true, his failure to show that his testimony would have had any effect on the outcome of the trial is fatal to a showing of prejudice under *Strickland.* *See Rega v. United States,* 263 F.3d 18, 20–26 (2d Cir.2001) (denial of the right to testify did not constitute ineffective assistance because petitioner failed to show prejudice), *cert. denied,* 534 U.S. 1096, 122 S.Ct. 847, 151 L.Ed.2d 725 (2002); *Brown v. Artuz,* 124 F.3d 73, 80–81 (2d Cir.1997) (no prejudice where "the only testimony [petitioner] claims he wanted to present would not have aided his . . . defense"), *cert. denied,* 522 U.S. 1128, 118 S.Ct. 1077, 140 L.Ed.2d 135 (1998). At most, Rosario–Dominguez's proposed testimony would have attacked Sanchez's credibility. *See* Pet. Mem. at 37–38. However, the record indicates that this was already accomplished through thorough cross-examination of Sanchez and Rosario–Dominguez's own views of Sanchez's credibility would hardly have been effective to impeach Sanchez. Furthermore, Burke's affirmation indicates that Rosario–Dominguez's testimony actually would have undermined the defense and thus that there was a valid reason for him not to testify. *See* Burke Affirm. II ¶ 4 (permitting Rosario–Dominguez to testify would have allowed jury to hear his voice and thus infer that he was in fact the "Jabao" on the tapes discussing narcotics). Thus, because Rosario–Dominguez fails to show prejudice, this claim of ineffectiveness must fail for this reason as well.

7. *Failure to Pursue Plea Negotiations and to Disclose a Plea Offer*

Rosario–Dominguez alleges that Burke was ineffective for failing to (1) pursue plea negotiations; and (2) disclose plea offer(s) made by the Government. Pet. Mem. at 32–33; *see also* Pet. Reply at 20–23. In support of this claim, Rosario–Dominguez states that he was unaware of any plea offer until his appellate counsel "intimated" that a plea carrying a sentence "between" 60 and 87 months had been offered. Pet. Aff. ¶ 9; Pet. Mem. at 33. Rosario–Dominguez further alleges that "had counsel advised [him] . . . about the offer, [he] would have been in a better position to weigh in on his options." Pet. Mem. at 33. Although Rosario–Dominguez's appellate counsel advised him that his unawareness of the plea offer may be a ground for arguing that trial counsel was ineffective, Pet. Aff. ¶ 9, he did not raise this issue on appeal.

In response to the petition, the Government's papers included an affirmation from Burke, who states:

I have a specific recollection of my representation of Mr. Rosario, and of the plea offers made by the Government to Mr. Rosario. I have a very specific recollection of promptly informing Mr. Rosario of each and every plea offer made by the Government. I also have a very specific recollection that the plea offers included stipulations by the Government not to seek a sentencing enhancement for his managerial role in the narcotics conspiracy. I do not remember the specific sentencing ranges of the plea offers, but I do recall going over the details of every offer with Mr. Rosario.

I also specifically recall that Mr. Rosario instructed me to reject each and every plea offer made by the Government because he wanted to go to trial on the charge.

It is my practice to make every effort to seek a reasonable and fair plea for my clients when appropriate or requested to

do so by the client. It is also my practice to always inform my clients of any plea offer and to review the offer with the client thoroughly so that the client may make a fully informed decision as to whether to take the offer. This is the same practice I followed with Mr. Rosario.

Affirmation of John Burke, dated January 6, 2004 ("Burke Affirm.") (annexed as Ex. B to Chang Decl.), ¶¶ 4–6. Only after Burke submitted a second affirmation addressing other issues did Rosario–Dominguez assert that there was no "substantiat[ion]" for Burke's statement that he engaged in plea discussions with the Government and that "no such discussions about any pleas occurred between Mr. Burke and myself. I would have certainly considered [a plea] and perhaps accepted it." Pet. Aff. II, ¶ 1.

As an initial matter, Rosario–Dominguez has offered no evidence that Burke did not discuss potential pleas with the Government. Rosario–Dominguez's observation that there is no "substantiat[ion]" for the statements in Burke's affidavit regarding plea discussions is of no moment as plea discussions are often undertaken only orally.

■■■■ With respect to whether the plea offers were communicated to Rosario–Dominguez, it is well established that "counsel must always communicate to the defendant the terms of any plea bargain offered by the prosecution." *Cullen v. United States,* 194 F.3d 401, 404 (2d Cir. 1999). Failure to do so constitutes deficient performance. *Id.; accord Pham,* 317 F.3d at 182 ("A defendant suffers a Sixth Amendment injury where his attorney fails to convey a plea offer."). Furthermore, " '[a] defense lawyer in a criminal case has the duty to advise his client fully on whether a particular plea to a charge appears to be desirable.' " *Boria v. Keane,* 99 F.3d 492, 496 (2d Cir.1996) (emphasis omitted)

(quoting *Model Code of Prof'l Responsibility* EC 7–7 (1992)); *accord Purdy v. United States,* 208 F.3d 41, 45 (2d Cir.2000) ("counsel must communicate to the defendant the terms of the plea offer, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed" (citations omitted)); *see Von Moltke v. Gillies,* 332 U.S. 708, 721, 68 S.Ct. 316, 92 L.Ed. 309 (1948) ("an accused is entitled to rely upon his counsel . . . to offer his informed opinion as to what plea should be entered"). Thus, the failure of counsel to provide any advice to the client concerning the acceptance of a plea independently constitutes deficient performance. *Boria,* 99 F.3d at 496–97; *accord Cullen,* 194 F.3d at 404.

Once again, however, no testimonial hearing is required on this issue. Rosario–Dominguez has submitted only conclusory and/or self-serving affidavits on the issue of whether Burke communicated plea offers to him. Burke, by contrast, has given a plausible and appropriately detailed description of their discussions. This situation is thus similar to *Chang* in that the Court finds Burke's explanation of what occurred to be far more credible. No testimonial hearing is required because it "would add little or nothing to the written submissions." 250 F.3d at 86. Based on the failure to show deficient performance, the claim of ineffective assistance is meritless.

■■■ Second, Rosario–Dominguez's claim fails for the separate reason that he has not shown any prejudice resulting from the alleged failure to disclose the plea offers. The prejudice element of the *Strickland* test in the context of counsel's failure to disclose a plea offer requires a showing that there is a "reasonable probability" the petitioner would have accepted

the plea. *E.g., Cullen,* 194 F.3d at 405. The Second Circuit "requires some objective evidence other than defendant's assertions to establish prejudice" although "a significant sentencing disparity in combination with defendant's statement of his intention is sufficient to support a prejudice finding." *Pham,* 317 F.3d at 182 (citing *Gordon,* 156 F.3d at 380–81); *see also Purdy v. Zeldes,* 337 F.3d 253, 259 (2d Cir.2003) (discussing a habeas court's "responsibility to actually make a credibility finding in each case, even absent objective evidence," but noting that "in most circumstances a convicted felon's self-serving testimony is not likely to be credible").

The Court recognizes that there is significant disparity between the sentence Rosario–Dominguez claims was offered (60 to 87 months) and the actual sentence he received (210 months). But the statements made by Rosario–Dominguez in his papers filed in support of this habeas petition lead to the conclusion that he would not have pled guilty had he known of such a plea offer. In his original memorandum of law, Rosario–Dominguez stated only that had he known of the plea offer he "would have been in a better position to weigh in on his options." Pet. Mem. at 33. Burke thereafter submitted his affirmation asserting that Rosario–Dominguez instructed him to reject every plea "because he wanted to go to trial on the charge." Burke Affirm. ¶ 5. In response, Rosario–Dominguez *did not controvert this statement* but instead argued, "The issue is *not* whether the Petitioner would have accepted such an offer or not ... [b]ut whether he was indeed given a chance to make an informed decision based on Counsel's com-

petent advi[ce]," Pet. Reply at 22. He contended only that the disparity between 87 months (the sentence he claims was offered) and 210 months (the sentence imposed) is itself "compelling enough." *Id.* Notably, it was only in a more recent affidavit that Rosario–Dominguez for the first time asserted that there was even a potential that he might have accepted the plea offer at the time. In that affidavit, however, he states only that, had he known of a plea offer, he "would have certainly considered [it] and perhaps accepted it." Pet. Aff. II ¶ 1.

The Second Circuit has found prejudice in certain instances where the petitioner has not explicitly stated that he would have accepted a plea offer. *See Mask v. McGinnis,* 233 F.3d 132, 141 (2d Cir.2000) (affidavit from petitioner stating that a plea of ten years to life was rejected because it was unreasonable but that a plea offer of eight to 16 years would have been reasonable "constitutes a sufficiently affirmative statement that he would have accepted a better plea agreement had it been offered"), *cert. denied,* 534 U.S. 943, 122 S.Ct. 322, 151 L.Ed.2d 240 (2001); *Boria,* 99 F.3d at 497 (had attorney expressed his professional opinion that an acquittal was "almost impossible" there would have been more than a "reasonable probability" that petitioner's family would have persuaded petitioner not to pursue the "suicidal" course of rejecting a plea offer).[4] In these cases, however, the court had some evidence upon which to base a conclusion that the petitioner would have accepted the offered plea. In *Mask,* this evidence consisted of an affirmative—albeit not defi-

---

4. *Cullen* is not entirely on point because, while the petitioner had testified at a hearing that he "probably" would have taken the guilty plea, 194 F.3d at 403 n. 2, the magistrate judge made an actual finding that the petitioner would have taken the guilty plea, *id.* at 403. The Second Circuit did not rule, however, that the magistrate judge was required to make such a finding based on this testimony. The court did rule, however, that the district judge could not reject the magistrate's credibility determinations without holding a new evidentiary hearing. *Id.* at 405–07.

nite—indication from the petitioner that he would have actually accepted the offer. *See* 233 F.3d at 141. In *Boria*, the court seems to have relied on the huge disparity between the one to three year prison term offered and the twenty years to life sentence imposed, coupled with defense counsel's testimony that he offered no advice as to the plea even though the only reason his client had for rejecting the plea was saving himself from being embarrassed in front of his children. *See* 99 F.3d at 495–98.

In contrast, Rosario–Dominguez's statements, even when considered along with the disparity between the length of imprisonment offered and that imposed, are not sufficient to establish even a "reasonable probability" that he would have pled guilty. As noted, Rosario–Dominguez made no suggestion in his initial papers that he would have accepted the plea but stated only that he "would have been in a better position to weigh in on his options," Pet. Mem. at 33. Rosario–Dominguez did not controvert counsel's statement that he insisted on going to trial, Burke Affirm. ¶ 5. It was only in a later affidavit that he suggested there was any potential for accepting the plea—and even in this affidavit he asserted only that he would have "perhaps" accepted it. Pet. Aff. II ¶ 1.

Rosario–Dominguez's position is thus most similar to that of the petitioner in *United States v. Perez Gomez*, 2003 WL 22119123, at \*5 (D.Conn. Aug.29, 2003), who stated only that he would have given a plea offer "serious consideration" and argued that he was prejudiced because he "was not able to make a knowing, voluntary and informed decision" about the undisclosed offer. After discussing the finding of prejudice in *Mask*, the *Perez Gomez* court stated, "In contrast to Mask's 'sufficiently affirmative statement,' Perez Gomez['s] ... failure to allege that he would have taken the offer in some form is fatal to his claim." *Id.* at \*5–\*6. Similarly,

Rosario–Dominguez did not state in any form that he would have taken the alleged offer of between 60 to 87 months, despite purportedly learning during his direct appeal of such an offer being made and despite being furnished with Burke's statement that Rosario–Dominguez specifically told him to reject any plea offers because he wanted to go to trial. In the context of Rosario–Dominguez's other statements in this Court, his recent statement that he "perhaps" would have taken the plea must be deemed insufficient.

Accordingly, Rosario–Dominguez's claim of ineffective assistance of counsel must fail both because he has failed to establish deficient performance and also because, in any event, he has not established prejudice caused by any alleged failure to disclose the plea offers.

### 8. *Failure to Investigate and Present Perron as a Defense Witness*

Rosario–Dominguez's final claim of ineffective assistance of counsel is that Burke failed to present Perron as a defense witness at trial. Pet. Mem. at 38–39; *see also* Pet. Reply at 25–27. As detailed above, Rosario–Dominguez has provided an affidavit from Perron affirming that Sanchez did not work at the bodega on West 135th Street during 1996. *See* Perron Aff. ¶ 4. Rosario–Dominguez also has submitted his own affidavit stating that Perron informed counsel that he was available to testify and that Burke failed to contact Perron despite an indication that he intended to do so. Pet. Aff. ¶¶ 5–6; *see also* Perron Aff. ¶ 5.

Burke has offered an explanation as to why he did not call Perron as a witness:

I conferred with Rosario regarding the "deli-ID" issue and informed him that in large part it was not relevant. Evidence showed that Sanchez knew Rosario and that my client's nickname was "Jabao." The defense argued to the

jury that Sanchez had used Rosario as an easy mark and named him to authorities as a replacement for the other "Jabao," who was a good friend of Sanchez. The defense did not argue to the jury that Sanchez and Rosario were strangers. The defense argued that Sanchez knew Rosario from the area.

Rosario agreed in the decision, not to call witnesses. It is my recollection that I did not speak to and was not contacted by Pablo Perron, the deli-owner.

Burke Affirm. II ¶¶ 5–6.

"The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *Nersesian,* 824 F.2d at 1321. Thus, the "failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel." *United States v. Eyman,* 313 F.3d 741, 743 (2d Cir.2002) (per curiam) (citations omitted), *cert. denied,* 538 U.S. 1021, 123 S.Ct. 1949, 155 L.Ed.2d 864 (2003); *accord United States v. Best,* 219 F.3d 192, 201 (2d Cir. 2000) ("[C]ounsel's decision as to whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." (internal quotation marks and citations omitted)), *cert. denied,* 532 U.S. 1007, 121 S.Ct. 1733, 149 L.Ed.2d 658 (2001); *Nersesian,* 824 F.2d at 1321 (the decision not to call witnesses "fall[s] squarely within the ambit of trial strategy, and, if reasonably made, will not constitute a basis for an ineffective assistance claim").

██ While the choice whether or not to call a particular witness is a strategic choice that is "virtually unchallengeable," counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 690–

91, 104 S.Ct. 2052. Thus, if Burke knew that Perron potentially had material favorable to Rosario–Dominguez's defense and failed to investigate what evidence he may have been able to offer at trial, his representation would have been deficient. In this case, however, Rosario–Dominguez's submissions indicate that the only testimony Perron would have offered was that he owned and operated the bodega on West 135th Street and that Sanchez did not actually work there during 1996 as he testified. *See* Perron Aff. ¶ 4. The submissions further indicate that defense counsel was aware of Perron and his potential testimony, *see id.* ¶ 5; Pet. Aff. ¶¶ 4–6—an assertion corroborated by Burke himself, *see* Burke Affirm. II ¶ 5. Assuming that Burke never spoke to Perron, *see* Pet. Aff. ¶ 6; Burke Affirm. II ¶ 6, counsel had a strategic reason for discounting the need to conduct any investigation into Perron's testimony. As discussed above, even Perron's proffered testimony would not have challenged Sanchez's observations that Rosario–Dominguez engaged in drug activities in 1996. Rather, it would have offered only an additional and relatively insignificant basis upon which to challenge Sanchez's credibility in a trial where his credibility was vigorously attacked on much more significant grounds.

Thus, the record does not reflect that Burke acted unreasonably in not interviewing Perron or calling him as a witness. Nor has Rosario–Dominguez overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation marks and citation omitted). Contrary to Rosario–Dominguez's assertions, the decision not to present Perron was not "tantamount to not presenting a defense," Pet. Reply at 25. Certainly, Sanchez's testimony as a whole was central to the Government's case against Rosario–

**524**

Dominguez. However, Sanchez's testimony that he worked in the bodega was only of marginal relevance to his overall testimony. *See United States v. Vargas,* 920 F.2d 167, 170 (2d Cir.1990) (ineffective assistance claim based on counsel's failure to call defense witnesses rejected where proffered testimony related only to "collateral matters"), *cert. denied,* 502 U.S. 826, 112 S.Ct. 93, 116 L.Ed.2d 64 (1991). The collateral significance of Sanchez's employment at the bodega leads to the conclusion that counsel's failure to further investigate Perron and call him as a witness was supported by a plausible defense strategy—that is, a strategy focused on attacking Sanchez's credibility on more relevant matters. In other words, aware of Perron's proffered testimony and aware of other more relevant ways to attack Sanchez's credibility, counsel fulfilled his obligation of "mak[ing] a reasonable decision that makes particular investigations unnecessary," *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Because trial counsel acted reasonably, we need not consider whether Rosario–Dominguez was prejudiced—that is, whether there is a reasonable probability that the outcome of the trial would have been different in light of Perron's proffered testimony, *see id.* at 694, 104 S.Ct. 2052.

*Conclusion*

For the foregoing reasons, Rosario–Dominguez's petition to vacate, set aside, or correct his sentence should be denied.

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to file any objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Jed S. Rakoff, 500 Pearl Street, New York, New York 10007, and to the undersigned at 40 Centre Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Rakoff. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Aug. 16, 2004.